### MAYNICKE v. CENTRAL REALTY BOND & TRUST CO.

(Supreme Court, Appellate Division, First Department. May 5, 1905.)

CORPORATIONS—CONTRACTS OF OFFICERS—LIABILITY OF CORPORATION.

Evidence *held* insufficient to show that the employment of plaintiff as an architect by certain officers and directors of defendant corporation was made on behalf of defendant.

Appeal from Trial Term, New York County.

Action by Robert Maynicke against the Central Realty Bond & Trust Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and PATTERSON, O'BRIEN, INGRAHAM, and LAUGHLIN, JJ.

Adrian H. Joline, for appellant.
L. Laflin Kellogg, for respondent.

INGRAHAM, J. The plaintiff seeks to recover in this action for services as an architect in preparing certain plans for a building upon the corner of Broad street and Exchange Place, in the city of New York. The complaint alleges that the defendant was

a corporation organized under the laws of the state of New York; that "between the 15th day of November, 1899, and the 1st day of May, 1900, the plaintiff rendered services to the defendant, at its request, as an architect, in making and preparing preliminary studies, general drawings, and specifications for a building contemplated to be erected upon the southeast corner of Broad street and Exchange Place, in the city of New York, at an estimated cost of $3,225,000, owned by the defendant, or contemplated to be purchased by it." The defendant was incorporated by an act of the Legislature (chapter 228, p. 651, of the Laws of 1898). By chapter 140, p. 230, of the Laws of 1900, this act of incorporation of the defendant was amended, by which the defendant was made a moneyed corporation, subject to the supervision of the Superintendent of Banks. It was provided that the property and affairs of the company should be managed by a board of directors; that there should be a president, secretary, and treasurer of the corporation, and such other officers as should be provided for by the by-laws. The company was authorized to invest its surplus capital in real estate. The by-laws of the company provided that there should be 15 directors, who were to elect a president, a first and second vice president, a secretary and treasurer. The duties of the president were to have general charge and supervision over the business and affairs of the company, and generally to perform such acts as are incident to his office and are permitted by law. In his absence or inability to act, his duties devolved upon the vice presidents. Provision was made for an executive committee, to be elected by the directors. The executive committee was given power to superintend and advise all investments that should be made with the funds of the company. It was provided that no loans on bond and mortgage or otherwise, and no purchases, sales, or pledges of any real or personal property, should be made, and no bonds, debentures, or other obligations, except checks or drafts made in the ordinary course of business of the company, should be issued, without the approbation and concurrence of the president and executive committee. The executive committee could, in its discretion, authorize the president to make investments without previously consulting the committee, but all such transactions were to be reported to the committee at its next meeting; and the executive committee could exercise any and all powers of the board of directors when said board was not in session. This corporation was authorized to do business, under the provisions of the act incorporating it, by the Superintendent of Banks, and was subsequently by said Superintendent designated as a depositary of money reserved in state banks and with individual bankers. By a resolution dated the 13th day of June, 1899, the directors constituted what was called a "real estate committee," but the powers of this committee do not seem to have been defined.

At the time of the transaction upon which this action is based, Mr. Henry Morgenthau was president of the company, and Mr. Southack and Mr. Ball were directors, and were also members of the real estate committee. Mr. Ehrmann was the secretary of

the company. While this company had authority to purchase and sell real estate, and issue bonds and other obligations based upon real estate mortgages, it had no express power to construct buildings or to borrow money for that purpose. Nor had the president or the real estate committee power, without authority from the board of directors or the executive committee, to make any contract or incur any obligation for the erection of buildings, or for the purchase of property for that purpose. The plaintiff testified (and it is upon his testimony that a verdict in his favor was obtained): That he saw Mr. Morgenthau in November, 1899, at the office of the defendant. That he called there at the request of Mr. Southack, and that there were present at that time Mr. Southack, Mr. Ball, and Mr. Morgenthau, and at intervals the secretary of the company. That the room in which this interview took place was a part of the building occupied by the defendant, in what was called the president's room. That there was then a general conversation between all of those present, except the secretary. That the substance of the conversation was that Mr. Southack said that the plaintiff came there to talk with them in regard to the building which was to be erected on the land of the Central Realty Bond & Trust Company, on Exchange Place and Broad street, and that on account of the building law being changed, and the change going into effect the latter part of that year, it would make a considerable difference in the construction of the building, as to the cost; that is, that the cost would be a great deal higher if constructed under the new law than it would be if constructed under the law as it was at that time. That Mr. Morgenthau talked with him in regard to the necessity of taking the necessary steps to prepare the plans for the building in advance, and "I [plaintiff] told them that the best way would be to prepare the plans and drawings in advance, and file an application with the building department, so that the building department could pass upon the plans before the new law went into effect." That after this conversation Mr. Morgenthau told the plaintiff that it would be best to go on and prepare plans and specifications, and file them with the building department. That the plaintiff then explained to those present the plans, and that it would be necessary to file them with the building department; that these plans would have to be filed by the 22d day of December, 1899, and, this meeting being on the 14th of November, that the time was very short, and an extraordinary amount of labor would be required to complete those plans sufficiently so that copies could be prepared from them for the building department. That Mr. Morgenthau said, "Now, if you don't build the building, what then?" "I told them then that if the Central Realty Bond & Trust Company did not build the building; that if the building was not built, the plans were not used, in that contingency I would—I would give them my time and my efforts for nothing, and I would share the expense with them, which would amount to $800 or $1,000, the actual cash outlay." That after some conversation the plaintiff was told to go on and make the plans for the building. That, in accordance with

these instructions, he made plans for a building upon the premises on the corner of Broad street and Exchange Place, and filed them with the building department in the latter part of December, before the new building law went into effect. That he was not employed to build a building upon the premises, and that the usual charge of architects for work of this kind was $81,000. The jury gave the plaintiff a verdict for $40,000.

It appeared that, some time prior to this interview, Morgenthau, Ball, and Southack had considered the advisability of purchasing this property on the corner of Broad street and Exchange Place, and erecting upon it a large office building. There is not the slightest evidence that it was ever intended that this building should be erected by the defendant, and certainly no suggestion had been made to the directors that the defendant should purchase the property and erect this building, and no authority had been given by the directors to any of the officers to enter into such operation. It is undisputed that the executive committee determined that the defendant would not build. Morgenthau, Ball, and Southack, however, had obtained options to purchase several pieces of property, which, with the property owned by the defendant, constituted the plot upon which the building was to be erected. The option for 25 Broad street was taken in the name of one Merrick, who was a clerk in Southack's office, and a cash payment of $10,000 thereon had been made to the owners by check of Southack & Co.; and on the same day the defendant advanced this sum of money to Southack & Co., and charged the same to said company under an account headed, "29 Broad Street." Subsequently Southack & Co. obtained a contract for the purchase of 31 and 33 Broad street and 54 and 58 Exchange Place. This was taken in the name of McCormick, and a cash payment of $10,000 was made to the owners by the defendant, and this amount was charged to Southack & Co. on an account headed "33 Broad Street." Southack & Co. then obtained a contract for the purchase of 29 Broad street, which was taken in the name of McCormick, and a cash payment of $5,000 was made, which was advanced to Southack & Co., and charged to them in the account headed "29 Broad Street." And at the same time when these payments were made, the defendant, to secure the payment of this sum of $25,000, took assignments of these various contracts in blank; and at the time of the interview these assignments were in the possession of the defendant, with the transferee's name in blank. To complete the purchase of these various pieces of property required several hundred thousand dollars. The transfers of these options or contracts, which were in blank, were subsequently filled up with the name of Peter J. Merrick, when the loan of $25,000 was repaid to defendant, and were subsequently assigned to one Hotchkiss, who completed the contracts and acquired the title to the property. It appeared, however, that one of the pieces of property which was included in the plot upon which the building was to be erected (44 to 52 Exchange Place) was owned by the defendant at the time of this conversation

with the plaintiff, and that it subsequently agreed to sell it for $800,000.

The work done by the plaintiff upon these plans was all done between the 15th of November and the 20th of December—about 35 days. The plaintiff testified that he was told at this interview that the company owned the Exchange Place property, but did not own the rest of the property upon which the building was to be erected. Upon cross-examination as to what took place at this interview, the plaintiff testified that he told Morgenthau that, if the plans were not used—if the building was not erected—"I would share my expenses with them;" that he told them it would be in the neighborhood of about $1,000, and that "I would give my time and my services for nothing"; that Mr. Ball then said, "We will share it all alike" ("we" meaning the four people who were present, including the plaintiff); that Mr. Ball then said to the plaintiff, "We will each pay $200 towards the expense of these plans"; that the arrangement was that "if the company should not build, if my plans were not used—if the building was not erected and my plans were not used—then we should share the expenses alike." The plaintiff further testified that after the 15th of December, some time before these plans were completed, Mr. Southack mentioned to him that the defendant would turn over the property, with the building permit, to the Alliance Realty Company; that there was nothing said to the plaintiff about what he would be paid in case the building were built under his supervision, and nothing said about what he should be paid if his plans were used. The plaintiff does not testify that the name of the defendant corporation was mentioned in this connection, except that he was told that the defendant owned the Exchange Place property, but not the rest of the property. Immediately after this conversation there was sent to the plaintiff by one of the vice presidents of the defendant a survey of the piece of property owned by the defendant. It would seem that the plaintiff had one other interview with Mr. Morgenthau about the 17th or 18th of November, when he brought some paper sketches of the building; that at this interview Mr. Morgenthau made a suggestion about changing the interior, which change was adopted; that this interview lasted about 15 minutes, and nothing was said about the plaintiff's compensation or employment; that about the 15th, 16th, or 17th of December the plaintiff was informed by Mr. Southack that there was a new corporation to be formed to erect this building, and that at the plaintiff's request he was allowed to subscribe to the stock of that company; that this company was called the Alliance Realty Company, and that this corporation subsequently acquired title to all the property and erected the building; that after these plans were finished they were filed with the building department, with an application, signed on behalf of the plaintiff, for approval by the department; that on March 17, 1900, the department disapproved of the plans, stating specific objections, whereupon the plaintiff on July 12, 1900, filed amendments to the application. It subsequently appeared that on

the 18th day of December the $25,000 that had been advanced by the defendant on account of these contracts was repaid to the defendant, one-half by Mr. Morgenthau and one-half by Mr. Ball, and that the contracts, with the assignments thereof still in blank, were surrendered by the defendant.

I think this evidence entirely insufficient to justify a finding that any contract was made by the defendant corporation. There can be no question but that purchasing property and erecting buildings thereon was not the regular business of this corporation, and at no time was it stated to the plaintiff that the defendant corporation intended to build. He was taken to the office of the corporation, and there saw the president and three other gentlemen. The discussion was entirely consistent with what was clearly proved to be the fact—that these four gentlemen that were present were the only ones who were engaged in this enterprise, and not the corporation. The plaintiff was instructed to prepare those plans, not on behalf of the corporation, but of the individuals there present. Shortly afterwards, and before the plans were filed, he was informed that another corporation had been organized, which was to construct the building, and he became a stockholder in this other corporation. He made no arrangement about his compensation, except that, if his plans were not used, he offered to do the work for nothing, when the gentlemen present agreed that they would each contribute $200 toward the actual expense of preparing the plans. This, it would seem, was notice of the fact that these gentlemen with whom the plaintiff had the conversation were the ones who were giving him the instructions as to the work that he was to do, and not this banking corporation, whose officers had no authority to go into a building operation of this kind without some action of the directors or the executive committee.

The learned trial judge, in submitting the question to the jury, stated that the defense was that this contract was not with the corporation at all, and then said:

"It is unnecessary for me to say that if the plaintiff understood at that time that he was dealing with a new company, not with the defendant corporation, and that it was to have the benefit of his services, why, then, you must render a verdict in favor of the defendant."

I think the question was not what the plaintiff understood, but what he was justified in understanding from what was said and done at the time he was employed. The liability of the defendant, as I view it, depended upon two propositions: First, that certain officers of the company, assuming to act on its behalf, made a contract with the plaintiff to perform services for the corporation; and, second, that these officers or agents of the corporation assuming so to act had authority to bind the corporation to make the contract to enforce which the action is brought. I do not think that there was any evidence to sustain a verdict that these officers of the corporation were at any time assuming to act on behalf of the corporation, or that the plaintiff was employed by the corporation. Nor do I think there is any evidence to sustain a finding

that, considering the character of the corporation, the powers conferred upon it by its charter and by-laws, and the authority given to the officers of the company, they had any authority to make such a contract as that testified to by the plaintiff, and which he assumed was made on behalf of the corporation because he was talking to its officers in the building of the corporation. Nor did the corporation in any way assume responsibility for any engagement that was made with the plaintiff. There was nothing to show that the corporation ever received any advantage or benefit from the services performed by the plaintiff. It never accepted the services of the plaintiff, or ratified any assumed authority to contract for it. It advanced to some of its directors $25,000, which they paid on account of the contracts for the sale of various portions of the premises upon which the building was subsequently erected, but that money was returned to the defendant by those interested in the property. As I view this evidence, it is entirely consistent with an individual employment of the plaintiff by those with whom he had the conversation about which he testified, that neither directly nor indirectly was it stated that the contract or employment was on behalf of the company, and that there was no evidence to justify a finding that the plaintiff was employed by the corporation to perform the services for which he seeks to recover. Thus, accepting as true the evidence of the plaintiff, it is not sufficient to justify a finding that the employment was on behalf of the defendant. When we consider that the corporation had never authorized any one to make any contract in relation to this building, that the executive committee had formally determined not to erect this building, and that the plaintiff is contradicted by every one of those who was present at the interview as to what was said about the defendant erecting the building, and when, as a fact, those with whom he made the contract had no authority to make such a contract for the defendant, it must, I think, be clear that a finding that this employment was on behalf of the defendant, or that the officers of the company had authority to make such a contract, cannot be sustained.

If these views are correct, it follows that the judgment and order appealed from must be reversed, and a new trial ordered, with costs to the appellant to abide the event.

VAN BRUNT, P. J., and O'BRIEN, J., concur. PATTERSON and LAUGHLIN, JJ., concur on the ground that verdict is against evidence.